24 1842 Sandra Herndon versus Chippewa Valley School District at all. Arguments not to exceed 15 minutes per side. Mr Dulley for appellant. Yeah. Yeah. Yeah. Yeah. Yeah. Yeah. Yeah. Good morning. Good morning, your honors. May it please the court. My name is Steve Dulley here on behalf of plaintiff appellant Sandra Herndon. I'd respectfully request three minutes of my time be reserved for rebuttal. There are a multitude of legal issues in this case, your honor, but I think the key and the most thorny legal issue is the distinguishing is the ability to distinguish between de minimis injury and nominal injury for purposes of First Amendment retaliation. We believe that this can be resolved by looking at the second element of a retaliation claim, namely would the allegedly retaliatory act deter a person of ordinary firmness. We think that that test implies a reasonability standard that takes a look at what the individual experienced and whether or not a combination of the magnitude of the harm that's been threatened and the likelihood of that harm occurring can give rise to a nominal action, even if no harm actually occurs. I mean, frankly, I don't really see this as whether you can bring a nominal action. I just see it as whether you've shown the existence of genuine issues and material fact as to the elements of your claim and whether you can overcome qualified immunity. Certainly this talk about whether you can bring an action for nominal damages sort of beside the point seems to me. Certainly, your honor. Well, and the question of adverse action to get at that one then, I think there is more than sufficient evidence to at least let this go to a jury. I think the case law indicates that except in instances where it is absolutely clear that there is no, that it's a de minimis injury, for example, that those are questions of fact to be resolved for a jury. And I think that goes for Apellis-Pydon and Apellis-Bednard for their claims in the personal capacity. And you're correct. At that point, we have to overcome qualified immunity for them. And then I think there's also the question of Apellis-Bednard and whether his conduct can be properly attributed to the school district under Monell and Pembower and all of those cases. Counsel, how do you overcome the argument that your client actually did not suffer any adverse action? Well, I think that that is the key distinction, your honor, is between an action being adverse and whether or not that adverse action caused any injury. Here, I think this falls in the category of cases where there's a threat to employment or economic livelihood and where there's a threat of a criminal investigation that is not the more generalized, layered standard of generalized surveillance. I'm on a list. This is a report specifically with my client and her name from both the Pydon complaint and the Bednard complaint. Okay, but the record below doesn't show any threat to your client's employment and doesn't show that she suffered any adverse action at all. So don't you really have a problem here? Well, I think that's a close question, but I'm not sure I would agree that she suffered no adverse action. I think it becomes a question of fact of whether Pydon's complaint and the waiver they're in are genuine and credible, i.e., I'm letting you know so that you can tell your officer that, hey, this may not be a good idea versus I happen to be an attorney. I know what the rules of the game are for First Amendment retaliation. Yes, I have disclaimed that I desire any investigation or anything to occur. It is carefully worded. I don't expect. It's not I don't intend and I don't want you to. It's I don't expect. Well, and there's also and I think that's comes into the credibility question, right? I think it's absolutely I agree that it's absolutely a reasonable jury could look at that and say she disclaimed it. There's no issue here. But this court just sort of took her at her word. Well, my question or my problem with you on the Pydon thing is how is she a state actor here? Well, I do think that's difficult, Your Honor. I think that comes into the issue of being clothed with authority or looking as though you're acting on behalf of the board. I agree, to be clear, that the board itself, the school district, cannot be held liable for that action. I think that the evidence does not bear it out for purposes of municipal liability. But I still think there's a question for the jury of, OK, was she coming at this action as someone who happens to be a public official? And who felt like this was inappropriate conduct? And yes, she mentioned her public official status, but she did so only because it was how all of this arose. Or is this an instance of a public official trying to put subtle pressure in her capacity as a public official on an employer? Well, she was I mean, I think a jury could readily find she's trying to, you know, exert. I mean, there's a reason why she sends this to your client's employer as opposed to your client or somebody else. But I mean, we have a 2024 case, Mackey, that said when asking whether he challenged action qualified as state action, the controlling issue is whether an official possessed state authority, in fact, and then whether she purported to act under that authority. But you have to show that Pydon possessed authority, in fact, to act on behalf of the board, I guess, here. And I just don't see how she had that authority here. Well, I think that gets into kind of a distinguishment when you're looking at Pydon's individual personal capacity, liability, qualified immunity versus the board liability and the attribution therein. I would agree with Mackey. And the way I interpret that is for the board purposes. Yes, absolutely. They would have to close her with authority, like with the bylaw that we argue for Appley Bednard. But I think Waters v. Morristown, which was out of 2001 from this circuit, seemed to indicate that apparent authority is enough as long as it's related to your status. Eric Murphy says otherwise, and he's usually a pretty good reporter on this stuff. Well, I do not agree with Eric. 83 itself says the action must be taken under color of state law. And it seems like here she's freelancing. I mean, I'm giving you a chance to tell me how that's wrong. Well, I don't know that it's necessarily wrong. I think that's an open question. I think the question is, is she freelancing? Is it credible that she's coming in a private capacity? Or is she coming at this as a public official in a very sophisticated way? And I don't, I think that question remains open. And I think the fact that she identified herself as a member of the board, that the complaint only refers to official complaints about her official conduct as a board member, those sorts of extraneous facts lend credibility to the fact that she was coming, acting under the color of state law. If a police officer, for example, gives me an unlawful order, that order is assuming it's clearly unlawful. I may not know that. I'm still responding to him or her as an official. But he possesses the authority. He's just misusing it. I mean, here, she just doesn't possess the board's authority is, I think, what the defendants are arguing. Perhaps. Well, perhaps. But I think there, I still think that remains a question, given the surrounding context of that. Isn't that a legal question though? We don't have a jury to decide that, you know? No, I do think that's a legal question. While I may disagree with the district court's conclusion on that legal question, I don't disagree that that question itself is not a factual one. I appreciate your straightforward answers. No, thank you. How about Mr. Bednard? I mean, with him, the record as it comes to us, I mean, I think qualified immunity is probably your challenge there. You have to point to a case from our circuit or obviously from the Supreme Court that would have made clear to Mr. Bednard at the time that his actions were going to violate your client's First Amendment rights. And if you look at that email, he, I mean, at least on the face of the email, he's complaining about conduct. He's not complaining about speech so much. The only speech he references in passing is your client's likening apparently of, you know, mask policies to sort of Nazi policy or something. But he's talking about intimidation, threats, harassment, etc. And your client had sent him an email just before then, which I think is in your brief, which is threatening. You know, the first two were free ellipses. So why in deciding whether there's a case that makes clear to Bednard that his action was illegal? I mean, don't we need to be looking for a case that says if you're making a report substantially based on conduct rather than speech, you're violating somebody's First Amendment rights? I guess if there's some little, if there's some piece of speech in there, but it's mostly you're concerned about conduct. In some ways, yes, Your Honor. I mean, I think I understand your position. It could have been clearer, but he's mostly complaining about conduct. What tells him that's illegal? Certainly. What I think the question with qualified immunity is essentially one of fair notice to reasonable official. And I think when you look at some of the cases that were out there, if this was a retaliatory act based on her conduct or speech in front of the school board, that I think was clearly established. I think you can look at cases like McElhaney. I think you can look at, pardon me, I've lost my position here. Yeah, no, I understand what you're saying. So I think you can look at those cases and say that it's clearly established. The conduct question, I don't know that those cases do clearly establish a speech versus conduct distinction. But I think some of the factual matters here also need to be accounted for, which is if you look at the language of his email, which did have some speech, but as you said, harassment, threats, intimidation. Overwhelmingly about conduct. Yes. But if you look at that, it overwhelmingly parallels the language of A.G. Garland's memo talking about what kind of activities they were going to investigate. So much with the Pyden situation where it's very artfully crafted, you could say the same with the Bednard complaint. Maybe it is a complaint about genuine conduct, or maybe it's a veiled complaint relying on that A.G. language to try and retaliate. And I think that retaliatory intent is really key. And that to me is based on surrounding facts and circumstances. That's based on her showing up to meetings. He's asking, yes, to curb the behavior. But he's talking about parents coming to these meetings regularly, speaking out. In this case, I don't know that you can really divorce the conduct from the speech because it's much like what I'm doing in front of you today where I'm speaking with you, but I'm also presenting and doing various other forms of expressive activity. Yeah, I mean, to be clear, I think you make a very strong point that both of these defendants are trying to elicit coercive action by the recipients of their messages. But in Bednard's case, I just don't see much in the record that would allow a jury to find that he's acting based on speech rather than conduct. And I think we all know that speech can cross into conduct when it's done a certain way. If it's done respectfully, it's speech. But if it's done in a way, it can be done in a way to threaten, intimidate, and harass people. I think we're all acutely aware of that these days. And the record as it comes to us seems to show Mr. Bednard acting on the latter concern about threatening and intimidating other people in the room, actually preventing them from speaking, than about the content of your client's speech. And I just don't see much in the record that supports a jury finding that he's actually acting and seeking adverse action, I grant, based on speech rather than something that's more like conduct. A point well taken. I mean, like, why am I wrong? Well, I'll try to answer that as briefly as I can. Why don't you think about it, you know, and you could do it on rebuttal. I don't, are presiding judges in charge? It's up to you. I'm more than happy to answer now or on rebuttal. Why don't you take it up on rebuttal? Your life's been on quite a long time now. Thank you. Thank you. Sorry about that. Good morning, Your Honors. May it please the court, Lindsay Hazen on behalf of the defendants. So we're here today with the benefit of the record and the unrefuted evidence which shows that plaintiff's First Amendment retaliation claim fails for three reasons. There's no state action. There's no adverse action. And even if there was an adverse action, it wasn't motivated by plaintiff's protective conduct. As Judge Kethledge already got into this court recently in Mackie v. Rising, made clear that there's no state action where a governmental actor does not engage in an alleged adverse action that is the type of authority that they possess. And we can see what type of authority governmental actors acting in their individual capacity may have when we look at a case like Fritz, where we have a case where defendants were going out of their way to contact a plaintiff's employer four times, they were insinuating that they had some kind of control over contracts, control over what kind of business the city could give them. There was a coercive authority present there that just isn't present here. And when it comes to defendant Bednard, Mackie explicitly holds that the conduct that the state permits anyone to engage in cannot qualify as state action. Bednard's complaint, if you will, was really clicking a button on a tip line that the United States put together after the AG released this memo. He released this memo. It was widely covered by the news. Bednard viewed a news report on it and got an aggressive email and said, there are some concerning things happening here. We've all read the email. He's seeking, I mean, I think a jury could easily find. He's seeking adverse, he's seeking adverse action. Okay. I mean, I just, you know, on summary judgment, I have a hard time seeing how they're not right on that. Sure. Well, even if we're, we do take it. What's the point? It's like, what's the point, Mr. Bednard? Well, you know, they just invited FBI investigation. That would seem to be a pretty, a jury could say that's the point. Sure. I understand that. But as our case law, like Samad and Fritz also made clear that they, individuals have their own first amendment right to speak out. He has his own first amendment right to report concerns when, you know, an aggressive group is making other constituents may be afraid to speak at public comment. It's a real concern that he has in the school district. And Fritz quoting Mezabov did address the constitutionally protected right to respond that it'd be inconsistent with core first amendment principles and basic notions of fairness, not to allow a government official to respond in some way. And Mr. Bednard, both Mr. Bednard and Ms. Biden, obviously are government officials, but as is plaintiff, just because she is a police officer doesn't mean she's a police officer 24 seven. She too is a mom. She too is a member of a community and a school district and is able to express her private views outside of her role as a police officer. Just as Ms. Biden and Mr. Bednard are entitled to. And yeah, but if you're sending in somebody's boss or the attorney general of the United States when he's invited sort of, you know, FBI or he's offered almost FBI action, then, you know, well, I mean, it just goes to one part of their claim, but yeah, it's different than what you just described, somebody just offering their private views sort of into the ether. Sure. That point is well taken, but I think that we can always go back to. Like, is this, please, I was just going to expand that we can go back to this doesn't qualify as a state action. We can look at the clearly established tests and see that plaintiff still cannot meet those burdens there, even if we take these as adverse actions. What role does Herndon's knowledge or lack of knowledge of the allegedly adverse action play in this case? I think it plays a significant role because that's what come really has an effect on this de minimis injury. And I really think that that is the total of the court's inquiry as plaintiff basically admits a de minimis injury. This is the perfect example of why the court has imposed that exception. There's no damages. There's no injury. Plaintiff's first notice of the email to her employer was when she was brought into a room by her supervisor, one of only two people that knew about it and said, hey, we got this email. You didn't do anything wrong. Nothing's going to happen. Nothing's put in her file. She leaves soon after and gets a better job with more pay that she's happier in. And when it comes to defendant Bednard, there's absolutely no indication that any kind of even investigation occurred. There's no indication these tips went anywhere. I mean, the Supreme Court's Susan B. Anthony case says it doesn't have to result in prosecution. It's, I mean, it's coercion. Coercion is the use of force or a threatened use of force. And this is, in their view, a threatened use of force. It's threatening them with the prospect of force. And that's always been a cognizable legal harm. Sure. But I think when we look at our precedent on First Amendment retaliation claims, we can see here that this doesn't rise to that level where those claims were dismissed when we're on summary judgment. If we look at Fritz in the case of Pydon, we have people who are calling the employer several times. They're employing their positions and threatening or insinuating that they could prevent how much business plaintiff's employer could do with them. And when it comes to Wurzelbacher in the case of defendant Bednard, just the mere idea or knowledge that some kind of search was conducted wasn't enough there either. And that was just a motion to dismiss on the pleadings. In regards to the Monell claim as well, defendant Pydon's email is not part of the analysis here before the court. And when it comes to defendant Bednard's report, an individual, even if they are the president of the board, cannot bind the district or board to decisions independently. And the board policy 143 specifically addresses the authority afforded to board of education members. Specifically provides that no one member possesses the powers of the board as a whole. But can't the president speak for the board? The president is designated as the spokesperson of the board, but an official action of the board cannot be effectuated without some kind of resolution, without some type of quorum there to make a decision. And when we look at case law about improper decisions without following procedures in the cases of board of education, we're looking at more open meetings act violations. Where several members of the board were gathered, made some type of decision, made a decision in closed session. But there's always more than one member of a board. And it makes sense because just because one board member is the president for a year or two, half a year, it doesn't mean that they're afforded an authority to walk around every day and bind everyone at the district and everyone at the board to their personal views. That's why we have a panel of people to make these decisions together. And I would also add that a city or a single alleged constitutional violation of which no other board members even had alleged knowledge of is insufficient to establish a custom of tolerance or acquiescence. And the unrefuted evidence at this point shows that there was no knowledge on part of any other board member for either of these actions. Finally, when it comes to the clearly established standard here, I would agree that plaintiff does have a significant hurdle when it comes to defendant Bednard's email. Because there isn't precedent suggesting responding to a request to report behavior is a constitutional violation. And really it's the kind of thing that our society encourages us to do. If we see something, we say something. If we notice something is wrong. And there are laws mandating that state reporters report child protection issues and things of that nature. And when it comes to the case law plaintiff cited, for example, McElhinney, I know he also cites Place v. Warren, these are decided 2023 and after, well after the events alleged in this lawsuit. And even then I think the case law there is unavailing in terms of clearly establishing the constitutional right. These cases- Is that the softball coach case? That's McElhinney, yeah. And that's a speech. I agree, it's a speech. And it's more about a school employee who interacts with their child. Where it makes sense, it makes more sense when we're talking about a coach, a principal, a teacher who's interacting with these kids day in and day out. Here, we're talking about board members, board members who never even met this child. They do not deal with that daily education. Really, in this case, we're in a period of the COVID pandemic where they're trying to do the best they can. They're following state mandates. And of course, they're open to criticism for that. So if the court has no further questions, I think I would sit down. All right. Thank you. Thank you, your honors. Judge Kesslidge, I would like to spend the bulk of my time on your question, but before I do, I have one very brief point that I'd like to make. We do not concede de minimis. We concede nominal, not de minimis. That's the nature of our argument. That being said, turning to your- Before you move on, I have some, I would like to explore just a little bit. You say this is an edge case. And I'm going to say that this is an edge case, but I'm going to say that it's not an edge case, because it's not an edge case. And that you cite, I think your roulette wheel example is what struck me as the extent of the claim that you are making as to what might be a viable cause of action. Because you look at, you ask the question, is it 5%, is it 20%, is it 50%? But it seems to me that where you end up is that you would say that there is a cause of action just by spinning the wheel. There does not have to be any, you're not doing what Judge Kethledge suggests. You're saying now there is a complete cause of action merely because the possibility of an adverse event is not zero. Am I misunderstanding your analogy? Not, no, Your Honor. I would clarify one point. You're correct that the spinning of the wheel to me would trigger the cause of action when the prize, so to speak, is sufficiently bad. So this can't be a case where there's just mere criticism in the public. One public official says, oh, well, their lawsuit is causing us problems, making us shut down the fireworks show, and now they're getting calls from the public. That's truly de minimis. But if you're spinning the wheel and you're talking about loss of a job, any other truly adverse economic livelihood loss, or criminal investigation or imprisonment, then I agree with you 100%. The spinning of the wheel is what triggers the problem. So a case that has, that the plaintiff testifies there was no effect whatsoever on me, I was undeterred, I did not have any compensable damages in any way. Your position is that that still states a claim. I do, because the test is what a reasonable person of ordinary firmness would do. We're essentially arguing that our client is extraordinarily firm in not being deterred. But what is the limiting principle? Well, I think that's where we get back to the magnitude of the harm versus the risk. If the magnitude of the harm is so small that you and I would not normally be affected by it, even if it comes to pass, then yes, de minimis. Question of law, it's done. But if we look at something and say, boy, if I put myself in this plaintiff's shoes, acting as a citizen at these meetings, and I find out, you know, because of what I'm doing, and this is a long process, she's speaking through these meetings all the way up through 2022 in the record. If you find out six months later, oh, they tried to have me investigated and they tried to get me fired, I personally would be deterred by that. Maybe I'm not a person of reasonable firmness, but I think that's where you look at, okay, what are they threatening versus how likely is it to have occurred? Particularly with the criminal complaint, I think, you know, if you call up the DOJ and ask them, am I under criminal investigation, they aren't likely to tell you. I don't want to waste all of, I know Judge Passler has some questions, I'm sorry, I'm just trying to understand the extent. And it's a pretty large category. It seems to me that you're proposing as an automatically available cause of action, and that's all I needed to understand was that, yeah, my understanding of what you propose is there. You know, I know the standard is what would deter a person of ordinary firmness, but even taking that standard into account, I think we're entitled to look at the factual circumstances of all the interactions and problems between these individuals here. And allegedly, your client was, and I know it hasn't been adjudicated as to whether your client was guilty of all these allegations, but allegedly your client was calling Pyden a Nazi and allegedly leaving messages that she should kill herself and all this kind of thing. And if all that was going on, it seems ludicrous to suggest that Pyden didn't have a right to report this or complain or seek protection or whatever else. So when you talk about what would deter a person of ordinary firmness, if your client was engaging in this outrageous and deplorable behavior, it's kind of hard to say that anything was going on here that would deter your client or that the deterrence of your client doesn't, the issue of that doesn't seem like a reasonable concern under these circumstances. So what would you say about all that? I'd say two things, one longer than the other. The first is, you're correct, we have conflicting statements of fact. Our client in her deposition swore up and down she never did any of that stuff, never knew anybody who did, never directed anybody to do it. That's in the deposition testimony. Obviously, Pyden's deposition says otherwise, as do discovery answers. That's a question of fact. If you want to remand it back to the district court for a trial, I'd be more than happy to address those issues and find out what the truth of that matter is. But I'd also like to point out that her statements as regarding our client's conduct are all post hoc, after the fact affidavits. When you look at what she actually complained to the supervisor about, it wasn't your police officer told me to kill myself, it was she's being disruptive, she's being harassing. One would think, I would think, that if that was the kind of conduct that was occurring, she would be a little more direct with a local police chief when saying it. The only other point... Bednard, the email to Bednard, where she said the first two were free, Frank, that's threatening. I mean, isn't that, I mean, that's not in dispute, is it? The nature of the threat is in dispute. I agree. The fact that it's a threat is not. She attached the ISON case. I think a reasonable observer would go, she was threatening to sue them if they keep silencing her. But I would agree that's generally cognizable as a threat of some sort. I think that's a thoughtful and fair answer. Thank you. On that.  What were you going to say? I don't even remember what I asked. Can you give us 30 seconds? Yes. Just a citation that may help clarify the murkiness of this speech. Okay. I think, generally speaking, cases like Leonard v. Cohen show us that speech and conduct can blur, but the Supreme Court recently talked about threats versus chilling effect, and that was in a case, Counterman v. Colorado, and that is 600 U.S. 66, that's 2023. Okay. So that may be helpful to your honor. I appreciate that. All right. Thank you very much. Thank you. The case is submitted.